# EXHIBIT A



LAW OFFICES OF

# HOFFMAN & HOFFMAN

*2600 East Bidwell Street, Suite 240*
*Folsom, CA 95630*
*Telephone: 916-985-2753*
*Facsimile: 916-985-8429*

*ATTORNEYS*
*Joseph A. Hoffman Esq. ***
*Sheri L. Hoffman, Esq.*
*Julia Himovitz, Esq.*

*PARALEGAL*
*De Anne Richert*
*LEGAL ASSISTANT*
*Kay C. Brigman*

**\* Certified Family Law Specialist
State Bar of California, Board of Legal Specialization**

**\* Certified Family Law Specialist
State Bar of California, Board of Legal Specialization**

April 4, 2011

Dear Sir or Madam:

I, Joseph Hoffman, am an attorney duly licensed in the state of California. My firm name is Hoffman & Hoffman and the addresses 2600 E. Bidwell St., Suite 240 Folsom, California, 95630. Phone number is 916-985-2753.

This letter of attestation is being provided on behalf of Nexus Development, LLC., and Daniel Chartraw. Nexus Development LLC, is the primary shareholder of AZROCK Holdings LLC, and Daniel Chartraw has authority to contract on behalf of both. The purpose of this letter is to verify that Nexus Development LLC, and Daniel Chartraw, are both clients of Hoffman & Hoffman. This letter will also attest that Nexus Development LLC and Daniel Chartraw own at least one ton of dory bars with a value of at least $6 million dollars.

Under the terms of the agreement Nexus Development and Daniel Chartraw agreed to utilize $6 million worth of dory bars as collateral for the $400,000 loan created therein. Nexus has previously sent 250 pounds of metal bars to the refinery of your choice as of this attestation. Additionally Nexus Development and Daniel Chartraw agreed to provide a 45%

discount on dory bars and a 15 to 20% discount on the Bullion for a minimum of one year from the date of the agreement. Lastly, Nexus Development and Daniel Chartraw agree to provide lender a return of the principal balance ($400,000.00) plus interest, which equates to 50% of the total principal, for a total of $600,000.00 within 15 to 30 days from the current $8.2 million contract.

It is anticipated that the $400,000 proceeds will be administered through my attorney-client trust account. It is further anticipated that $398,000.00 will be used to purchase the equipment necessary to make the refinery fully operational and the remaining funds will be attorneys fees .

I hereby certify that the information I have stated above are true statements based on documentation provided to me.

Date: Apr 05, 2011

Signature: _____

# EXHIBIT B

# FW: 400k loan

From: Jonatrhan Cannon (jcannon21@optonline.net)
Sent: Wed 7/11/12 5:59 AM
To:    Thomas Stanziale (tstanziale@hotmail.com)
         5 attachments
         LOAN AND SECURITY AGREEMENT dev 400.pdf (129.4 KB) , 1Brian Utah-1.pdf (2.6 MB) , 2Brian
         Utah.pdf (3.8 MB) , 3Brian Utah.pdf (3.1 MB) , 4Brian Utah-1.pdf (3.0 MB)

---

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Monday, April 04, 2011 1:49 PM
**To:** jcannon21@optonline.net
**Subject:** FW: 400k loan


He closed on Mine march 10th that is why the assetation by the attorney


*Best Regards*


*Mike Deegan*

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

---

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Sunday, April 03, 2011 2:45 PM
**To:** 'jcannon21@optonline.net'
**Subject:** FW: 400k loan

This is all I have so far

Best Regards

## Mike Deegan

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

---

**From:** Andreas Weisz [mailto:weiszandreas@gmail.com]
**Sent:** Wednesday, March 30, 2011 4:49 PM
**To:** Mike Deegan
**Subject:** Fw: 400k loan

**From:** Daniel Chartraw

**Sent:** Wednesday, March 30, 2011 2:00 PM

**To:** weiszandreas@gmail.com

**Subject:** 400k loan

this is part one of two emails for you:

this includes 4 pic's of the refinery itself

sec agreement

the attorney was in court and on his way back now and will have the following asap:

second sec agreement

Overview of refinery and its history

ownership documents

Once again i just wanted to say thank you for moving forward and I hope to create a long standing relationship with you and your guys company.

thanks

Dan

Case 2:12-cv-02844-JFB-ETB   Document 18-1   Filed 08/23/12   Page 8 of 49 PageID #: 276

# FW: part 1 of 2

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent: Wed 7/11/12 5:56 AM
To:       Thomas Stanziale (tstanziale@hotmail.com)

       3 attachments
       airwaybill163608AZRPHAZAHM-BRUAWB24Feb1108Mar11Del-1.pdf (64.8 KB) , IMG00163-
       20101115-2012.jpg (54.3 KB) , IMG00182-20101216-1449.jpg (47.0 KB)

---

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Tuesday, April 05, 2011 11:09 AM
**To:** jcannon21@optonline.net
**Subject:** FW: part 1 of 2

Part 1 of 2

*Best Regards*

*Mike Deegan*

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

---

**From:** Daniel Chartraw [mailto:dchartraw1@gmail.com]
**Sent:** Tuesday, April 05, 2011 10:20 AM
**To:** mikedeegan@ufigtoday.com
**Subject:** part 1 of 2

Case 2:12-cv-02844-JFB-ETB   Document 18-1   Filed 08/23/12   Page 9 of 49 PageID #: 77

air way bill and two pics and the second email will be the attestation and contract of payment.....
send all in one package and that should do it for any of your guys..

065-8497 2602

**HAWB No.** BOM00035000

| | |
|---|---|
| Shipper's Name and Address | Shipper's Account Number |

COSIL PRODUCTS PVT.LTD.
RAJ VYAS 91-9426 456760
701 ATLANTA TOWER.
AHMEDABAD-380015.INDIA.
PHONE 91 9426456760

**Non Negotiable**
**Air Waybill**
(Air Consignment note Issued by)

**hellmann**
Worldwide Logistics
**INDIA**

Copies 1, 2 and 3 of this Air Waybill are originals and have the same validity

Consignee's Account Number

MONTULET ESTATES C.V.
PHILIPPE MONTULET
3800 SINT TRUIDEN.LIMBURG. BELGIUM
PHONE: 0032 486989340

It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF. THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIERS LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

Issuing Carrier's Agent Name and City

HELLMANN WORLDWIDE LOG.INDIA PVT.LTD.
AHMEDABAD

Accounting Information

#FREIGHT PREPAID#
#DIMS: 118X30X19[CM]=1 PLT
HAWB NO. BOM00035000
HAWB NO. 065-8437 2502

Agent's IATA Code

Account No.

Airport of Departure (Addr. of first Carrier) and requested Routing

Reference Number

Optional Shipping Information

| To | | By | To | By | To | By | Currency | CHGS Code | WT/VAL PPD COLL | Other PPD COLL | Declared Value for Carriage | Declared value for Customs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BOM | | | | | | | USD | PP | X | | NVD | NVI |

Airport of Destination

Flight/Date

Amount of Insurance

INSURANCE - If carrier offers insurance, and such insurance is requested in accordance with conditions on reverse hereof, indicate amount to be insured in figures in box marked "amount of insurance"

Handling Information

PLEASE INFORM CONSIGNEE IMMEDIATELY ON ARRIVAL OF CARGO
MARKS     1-PALLET [ONE ONLY.]
&
XXX

| No. of Pieces RCP | Gross Weight | kg lb | Rate Class Commodity Item No. | Chargeable Weight | Rate / Charge | Total | Nature and Quantity of Goods (Incl. Dimensions or Volume) |
|---|---|---|---|---|---|---|---|
| 1 | 117.40 K/G | | | 118.0 | | | ENGG.GOODS. IRON BARS. |

Notify :- Hellmann Worldwide Logistics N.V.. Brucargo Building
725 - 1st floor Zaventem. Belgium FAX: +32 2 254 29 50
Phone:+1 817 481 8050 Fax: +1 817 481 8351

INV.NO.163608
DT.24.02.2011
S/B NO.
DT.

| Prepaid 117.40 | Weight Charge | Collect | Other Charges |
|---|---|---|---|

Valuation Charge

Tax

EXWRK:     AGENCY:     DOC:     HAWB:

Total other Charges Due Agent

Total Other Charges Due Carrier

Shipper certifies that the particulars on the face hereof are correct and that insofar as any part of the consignment contains dangerous goods, such part is properly described by name and is in proper condition for carriage by air according to the applicable IATA Dangerous Goods Regulations.

Total prepaid

Total collect

HELLMANN WORLDWIDE LOGISTICS INDIA PVT.LTD.

Currency Conversion Rates

CC Charges in Dest Currency

Executed on     (Date)     at     (Place)     Signature of Issuing Carrier or its Agent

For Carrier's Use only at Destination

Charges at Destination

Total Collect Charges / AHMEDABAD.

**HAWB No.**

**Extra Copy**



# FW: part 2

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent:  Wed 7/11/12 5:55 AM
To:      Thomas Stanziale (tstanziale@hotmail.com)
           3 attachments
           Signed Attestation .pdf (90.3 KB) , page 1 of carter contract.jpg (2.9 MB) , page 2 carter
           contract.jpg (1828.9 KB)

Thomas,


This is the one you wanted!!!!!


Jon

_____

From: Mike Deegan [mailto:mikedeegan@ufigtoday.com]
Sent: Tuesday, April 05, 2011 11:13 AM
To: jcannon21@optonline.net
Subject: FW: part 2


Looks pretty good, I think it is worth a call to Dan, basically attorney is verifying everything Dan has told us.  Keep this confidential.  Call me


*Best Regards*



*Mike Deegan*

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

**From:** Daniel Chartraw [mailto:dchartraw1@gmail.com]
**Sent:** Tuesday, April 05, 2011 10:43 AM
**To:** mikedeegan
**Subject:** part 2

this is the law firm attestation and a copy of one of the contracts that is paying out witch the law firm contested too... this stuff is confidential and especially the contract so please refrain from calls and distributing to people without my prior authorization.. thanks Dan

# FW: pics of customs

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent: Wed 7/11/12 5:52 AM
To:      Thomas Stanziale (tstanziale@hotmail.com)
         3 attachments
         customs.JPG (311.9 KB) , customs2.jpg (59.7 KB) , joes banking.pdf (33.7 KB)

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Wednesday, April 06, 2011 6:07 PM
**To:** jcannon21@optonline.net
**Subject:** FW: pics of customs

*Best Regards*

*Mike Deegan*

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

**From:** Daniel Chartraw [mailto:dchartraw1@gmail.com]
**Sent:** Tuesday, April 05, 2011 12:24 PM
**To:** mikedeegan
**Subject:** pics of customs

Case 2:12-cv-02844-JFB-ETB   Document 18-1   Filed 08/23/12   Page 15 of 49 PageID #: 283

pics of customs


also Joe Hoffmans banking for attorney client account at JP Morgan Chase...

# FW: MOU for Jon on other funding for future projects

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent:  Wed 7/11/12 5:41 AM
To:    Thomas Stanziale (tstanziale@hotmail.com)

---

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Thursday, April 07, 2011 10:44 AM
**To:** jcannon21@optonline.net
**Subject:** FW: MOU for Jon on other funding for future projects

Wish I knew how to verify funds will be available

*Best Regards*

## *Mike Deegan*

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

---

**From:** Daniel Chartraw [mailto:dchartraw1@gmail.com]
**Sent:** Thursday, April 07, 2011 10:41 AM
**To:** mikedeegan
**Subject:** MOU for Jon on other funding for future projects

I will provide to Jon up to 10 million dollars of funding under a non recourse loan type program
for his ongoing and future real estate ventures as long as they are of sound investments to his

Case 2:12-cv-02844-JFB-ETB   Document 18-1   Filed 08/23/12   Page 17 of 49 PageID #: 225

knowledge.  I also will require to have Jon provide the personal guarantee for the 50k this morning and I Daniel Chartraw will be guaranteeing it personally also along with putting up the normal collateral.  I will have my attorney put this together formally for you as soon as I know the deposit is being made this 7th day of April, 2011. thanks Dan

# FW: here you go...

From: **Jonathran Cannon** (jcannon21@optonline.net)
Sent: Wed 7/11/12 5:41 AM
To:    Thomas Stanziale (tstanziale@hotmail.com)
        2 attachments
        jon sec agreement 1.doc (285.5 KB) , jon sec agreement 2.docx (67.5 KB)

---

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Thursday, April 07, 2011 1:48 PM
**To:** jcannon21@optonline.net
**Subject:** FW: here you go...

*Best Regards*

## Mike Deegan

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

---

**From:** Daniel Chartraw [mailto:dchartraw1@gmail.com]
**Sent:** Thursday, April 07, 2011 1:43 PM
**To:** mikedeegan
**Subject:** here you go...

# FW: passport

From: **Jonatrhan Cannon** (jcannon21@optonline.net)

Sent: Wed 7/11/12 5:43 AM

To:  Thomas Stanziale (tstanziale@hotmail.com)

  2 attachments

  Scan.jpeg (1931.2 KB) , ATT00004.htm (0.1 KB)

---

**From:** Mike Deegan [mailto:mikedeegan@ufigtoday.com]
**Sent:** Thursday, April 07, 2011 3:45 PM
**To:** jcannon21@optonline.net
**Subject:** FW: passport

For your records thought you might want this

*Best Regards*

# *Mike Deegan*

United Financial Insurance Group

Direct:  904-434-3139

Fax: 904-285-1614

www.UFIGTODAY.COM

The Leader in commercial, private money and jv partnerships,  We will get you the money

---

**From:** dchartraw1@gmail.com [mailto:dchartraw1@gmail.com]
**Sent:** Thursday, April 07, 2011 3:37 PM
**To:** Mike Deegan
**Subject:** Fwd: passport

Case 2:12-cv-02844-FB-ETB   Document 18-1   Filed 08/23/12   Page 20 of 49 PageID #: 222

Thank You,


Daniel L Chartraw

209-649-6473


Begin forwarded message:

> **From:** Daniel Chartraw <dchartraw1@gmail.
> **Subject: passport**
>
> ="Scan.jpeg" Co


--Forwarded Message Attachment--

# FW:

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent:  Wed 7/11/12 5:45 AM
To:    Thomas Stanziale (tstanziale@hotmail.com)

**From:** Mike Deegan [mailto:mdeeganpvb@gmail.com]
**Sent:** Wednesday, May 04, 2011 2:46 PM
**To:** jcannon21@optonline.net
**Subject:** Re:

spoke to hoffman yes he works with dan.  did not bring up anything else because I do not want to affect your dwl

On Wed, May 4, 2011 at 2:25 PM, <jcannon21@optonline.net> wrote:

In a mtg with arch

Sent via BlackBerry by AT&T

---

**From:** Mike Deegan <mdeeganpvb@gmail.com>

**Date:** Wed, 04 May 2011 14:20:48 -0400

**To:** <jcannon21@optonline.net>

**Subject:**

Are you in

## FW: Wire

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent: Wed 7/11/12 5:46 AM
To: Thomas Stanziale (tstanziale@hotmail.com)

**From:** Mike Deegan [mailto:mdeeganpvb@gmail.com]
**Sent:** Thursday, May 05, 2011 9:41 AM
**To:** jcannon21@optonline.net
**Subject:** Fwd: Wire

---------- Forwarded message ----------
From: **Mike Deegan** <mdeeganpvb@gmail.com>
Date: Wed, May 4, 2011 at 3:02 PM
Subject: Wire
To: dchartraw1@gmail.com

I am done asking for something we agreed to over 3 weeks ago.
I am sure there is some kind of legit reason beyond your
control.  You returned all my calls when we were verifying the
wire for your deal and now that i am looking for my measly
2500 I can not reach you thought that we were going to do a lot
of work together, however I just can not figure things out one
minute we are talking about tungsten mikes in California, to
selling discounted gold, which we could have done and still
could sell .

You have always mentioned being a man of your word I hope
that is  the case in regards to Jon's pay off and future deals. I
will leave you be regarding the fees and i am sure it will take

car of itself.

Jon and i would like to fly out to meet you to finalize the next
financing piece For his project in Vermont you Had mentioned
to Jon it would be ready some time next week.

Best Regards

Mike Deegan

904-434-3139

# FW: Dan chartraw

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent: Tue 7/10/12 2:06 AM
To:    Thomas Stanziale (tstanziale@hotmail.com)

**From:** Mike Deegan [mailto:mdeeganpvb@gmail.com]
**Sent:** Thursday, May 19, 2011 4:23 PM
**To:** jcannon21
**Subject:** Fwd: Dan chartraw

Please see below

---------- Forwarded message ----------
From: **Mike Deegan** <mdeeganpvb@gmail.com>
Date: Thu, May 19, 2011 at 1:37 PM
Subject: Re: Dan chartraw
To: Joe Hoffman <joe@hoffmanandhoffman.com>

It is jon cannon,  Dan told me you would be wiring funds.

On Wed, May 18, 2011 at 6:44 PM, Joe Hoffman <joe@hoffmanandhoffman.com> wrote:

It is my understanding that Dan is dealing directly with John  Conner on this issue.  If this is not your
understanding, please let me know.

Joe Hoffman

The contents of this e-mail message and its attachments are intended solely for
the addressee(s) hereof.  In addition, this e-mail transmission may be
confidential and it may be subject to privilege protecting communications
between attorneys or solicitors and their clients. If you are not the named
addressee, or if this message has been addressed to you in error, you are
directed not to read, disclose, reproduce, distribute, disseminate or otherwise
use this transmission.  Delivery of this message to any person other than the
intended recipient(s) is not intended in any way to waive privilege or
confidentiality.  If you have received this transmission in error, please alert
the sender by reply e-mail; we also request that you immediately delete this

message and its attachments, if any.

---

 

Joseph Hoffman, Certified Family Law Specialist

2600 East Bidwell Street, Suite 240

Folsom, CA 95630

916-985-2753

916-985-8429 (facsimile)

---

**From:** Mike Deegan [mailto:mdeeganpvb@gmail.com]
**Sent:** Wednesday, May 18, 2011 10:16 AM
**To:** Joe Hoffman
**Subject:** Dan chartraw

Joe, You are a busy man please call me regarding a attestation letter that Dan sent me. His note is coming due today and he said that he was sending payment through your firm. Please advise of status.

Best Regards

Mike Deegan

# FW: Daniel Chartraw Attestation Letter

From: **Jonatrhan Cannon** (jcannon21@optonline.net)
Sent:  Wed 7/11/12 6:02 AM
To:    Thomas Stanziale (tstanziale@hotmail.com)
       1 attachment
       HELLMAN.doc (115.0 KB)

Thomas,

He never responded to any of these emails to deny the letter.

Jon

---

**From:** Henry [mailto:henry@spaciousliving.com]
**Sent:** Wednesday, June 29, 2011 11:33 AM
**To:** jcannon21@optonline.net
**Subject:** Re: Daniel Chartraw Attestation Letter

letter to Hellman

**From:** "jcannon21@optonline.net" <jcannon21@optonline.net>
**To:** joe@hoffmanandhoffman.com
**Cc:** henry@spaciousliving.com
**Sent:** Thursday, June 23, 2011 11:45 AM
**Subject:** Daniel Chartraw Attestation Letter

Joe,

My name is Jonathan Cannon and I am involved in a transaction with your client Daniel
Chartraw. He used the attached attestation letter in addition to other documents, to obtain a

short term bridge loan for his business. I would like to know that in fact this letter was written and signed by you on April 4, 2011 and that all the information that is included in this letter is true to the best of your knowledge. I would appreciate a prompt response to this as time is of the essence with regard to this transaction with your client Daniel Chartraw.


Thanks in advance,



Jonathan Cannon

# EXHIBIT C

## SECURITY AGREEMENT

1.      Grant. On this 7th the day of April, 2011, Daniel L. Chartraw and NEXUS DEVELOPMENT, LLC, a California and Nevada  Based corporation with its principal place of business at 175 Sonoma Lane, Carmel Highlands, CA  93923 (hereinafter called **"Debtor"**), for valuable consideration, receipt whereof is acknowledged, grants to New England Development Corp. a Vermont Based corporation with its principal place of business at PO Box 1390, West Dover, Vermont (hereinafter called **"Secured Party"**) a security interest in, and mortgages to Secured Party, the following described property and interests in property of Debtor (hereinafter called the **"Collateral"**):

Daniel L. Chartraw, and NEXUS DEVELOPMENT, LLC will sign personally and collectively to back this loan with the 1 ton sitting in an warehouse located in Folsom CA, and or Brussels worth an estimated market value of Six million ($6,000,000.00) US dollars at six million ($6,000,000.00) US dollars each ton value contested by the attorney Joe Hoffman with Hoffman and Hoffman located in Folsom, CA.

To secure payment of the following obligations of Debtor to Secured Party (all hereinafter called the **"Obligations"**):

(I) All obligations and liabilities of Debtor to Secured Party (including without limitation all debts, claims and indebtedness) whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and/or from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing and however arising, or by oral agreement or operation of law or otherwise.

2.      Warranties and Covenants of Debtor.  Debtor warrants and covenants that:

(a)      Except for the security interest granted hereby and the security interest granted to New England Development Corp. (**"Secured Party"**), Debtor is the owner of the Collateral free from any adverse lien, security interest or encumbrance; and Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

(b)      No Financing Statement covering any of the Collateral or any proceeds thereof is on file in any public office, except in favor of NEXUS DEVELOPMENT, LLC. The Debtor shall immediately notify the Secured Party in writing of any change in name, address, identity or corporate structure from that shown in this Agreement and shall also upon demand furnish to the Secured Party such further information and shall execute and deliver to Secured Party such financing statements and other documents in form satisfactory to Secured Party and shall do all such acts and things as Secured Party may at any time or from time to time reasonably request or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the Obligations, subject to no adverse liens or encumbrances; and Debtor will pay the cost of filing the same or filing or recording this agreement in all public offices wherever filing or recording is deemed by Secured Party to be necessary or desirable.  A carbon, photographic or other reproduction of this agreement is sufficient as a financing statement.

(c)    Debtor will not sell or offer to sell, assign, pledge, lease or otherwise transfer or encumber the Collateral or any interest therein, without the prior written consent of Secured Party.

(d)    Debtor shall keep the Collateral at all times insured against risks of loss or damage by fire (including so-called extended coverage), theft and such other casualties as Secured Party may reasonably require, including collision in the case of any motor vehicles, all in such amounts, under such forms of policies, upon such terms, for such periods and written by such companies or underwriters as Secured Party may approve, losses in all cases to be payable to Secured Party and Debtor as their interests may appear. All policies of insurance shall provide that Secured Party's interest therein shall not be invalidated by the act, omission or neglect of anyone other than Secured Party and for at least ten days' prior written notice of cancellation to Secured Party. Debtor shall furnish Secured Party with certificates of such insurance or other evidence satisfactory to Secured Party as to compliance with the provisions of this paragraph. Secured Party may act as attorney for Debtor in making, adjusting and settling claims under and cancelling such insurance and endorsing Debtor's name on any drafts drawn by insurers of the Collateral.

(e)    Debtor will keep the Collateral free from any adverse lien, security interest or encumbrance and in good order and repair, shall not waste or destroy the Collateral or any part thereof, and shall not use the Collateral in violation of any statute, ordinance or policy of insurance thereon.

Secured Party may examine and inspect the Collateral at any reasonable time or times, wherever located.

(f)    Debtor will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note or notes evidencing the Obligations.

3.    <u>Additional Rights of Parties</u>.  At its option, Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance on the Collateral upon failure by the Debtor, after having been requested to do so, to provide insurance satisfactory to the Secured Party, and may pay for the maintenance, repair, and preservation of the Collateral.  To the extent permitted by applicable law, Debtor agrees to reimburse Secured Party on demand for any payment made, or any expense incurred by Secured Party pursuant to the foregoing authorization.   Until default Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this agreement and not inconsistent with any policy of insurance thereon.

4.    <u>Events of Default</u>.  Debtor shall be in default under this agreement upon the occurrence of any of the following events or conditions, namely: (a) default in the payment or performance of any of the Obligations or of any covenants or liabilities contained or referred to herein or in any of the Obligations; (b) any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor proving to have been false in any material respect when made or furnished; (c) loss, theft, substantial damage, destruction, sale or encumbrance to or any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; (d) dissolution, termination of existence, filing by Debtor or by any third party

against Debtor of any petition under any Federal bankruptcy statute, insolvency, business failure, appointment of a receiver of any part of the property of, or assignment for the benefit of creditors by, Debtor; or (e) the occurrence of an event of default in any agreement between Debtor and/or Secured Party.

5.    Remedies.   UPON DEFAULT AND AT ANY TIME THEREAFTER, SECURED PARTY MAY DECLARE ALL OBLIGATIONS SECURED HEREBY IMMEDIATELY DUE AND PAYABLE AND SHALL HAVE THE REMEDIES OF A SECURED PARTY UNDER THE UNIFORM COMMERCIAL CODE OF CALIFORNIA, including without limitation the right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose may, so far as Debtor can give authority therefor, with or without judicial process, enter (if this can be done without breach of the peace), upon any premises on which the Collateral or any part thereof may be situated and remove the same therefrom (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the Uniform Commercial Code of California and Nevada ); and the Secured Party shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to Debtor's right of redemption in satisfaction of the Debtor's Obligations as provided in the Uniform Commercial Code of California and Nevada . Secured Party without removal may render the Collateral unusable and dispose of the Collateral on the Debtor's premises. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party for possession at a place to be designated by Secured Party which is reasonably convenient to both parties.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtor at least 5 days' notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made.  The requirements of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Debtor shown at the beginning of this agreement at least ten days before the time of the sale or disposition.  Secured Party may buy at any public sale.  The net proceeds realized upon any such disposition, after deduction for the expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorney's fees and legal expenses incurred by Secured Party, shall be applied in satisfaction of the Obligations secured hereby.   The Secured Party will account to the Debtor for any surplus realized on such disposition and the Debtor shall remain liable for any deficiency.

The remedies of the Secured Party hereunder are cumulative and the exercise of any one or more of the remedies provided for herein or under the Uniform Commercial Code of California and Nevada shall not be construed as a waiver of any of the other remedies of the Secured Party so long as any part of the Debtor's Obligation remains unsatisfied.

6.    General.  No waiver by Secured Party of any default shall operate as a waiver of any other default or of the same default on a future occasion.  All rights of Secured Party hereunder shall inure to the benefit of its successors and assigns; and all obligations of Debtor shall bind its successors or assigns.  If there be more than one Debtor, their obligations hereunder shall be joint and several.  This agreement shall become effective when it is signed by Debtor.

All rights of the Secured Party in, to and under this agreement and in and to the Collateral shall pass to and may be exercised by any assignee thereof.  The Debtor agrees that

3

if the Secured Party gives notice to the Debtor of an assignment of said rights, upon such notice the liability of the Debtor to the assignee shall be immediate and absolute.  The Debtor will not set up any claim against the Secured Party as a defense, counterclaim or set-off to any action brought by any such assignee for the unpaid balance owed hereunder or for the possession of the Collateral, provided that Debtor shall not waive hereby any right of action to the extent that waiver thereof is expressly made unenforceable under applicable law.

If any provision of this agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this agreement.

Debtor:  Daniel  L.  Chartraw                                                    Secured  Party:

_____
Nexus Development, LLC
By:                                                                                      By:




Its: Member

4

## ASSIGNMENT

FOR VALUE RECEIVED, the Secured Party sells, assigns and transfers to New England Development Corp., its successors and assigns with recourse, all right, title and interest in, to and under the foregoing agreement and in and to the Collateral therein described, with authority to take either in its own name or in the name of the Secured Party, but for its own benefit, all such proceedings, legal or equitable, as the Secured Party might have taken but for this assignment.

The Secured Party warrants that the foregoing agreement represents a valid security agreement as provided under the laws of the State of California and Nevada.

Daniel L. Chartraw and NEXUS DEVELOPMENT, LLC

By:

Its:  Member

5

# EXHIBIT D

Hoffman & Hoffman
2600 E. Bidwell Street Suite 240
Folsom, CA 95630
916-985-2753 Fax 916-985-8429

# Memo

**To:**    Daniel L. Chartraw
**From:** Joseph A. Hoffman
**Date:** October 4, 2010
**Re:**    Daniel L. Chartraw

## Message

****ANY MONIES RECEIVED IN THIS ACCOUNT WILL BE DEEMED AS RECEIVED BY DANIEL L. CHARTRAW

RECEIVING INSTITUTION INFORMATION:

| | |
|---|---|
| BANK NAME: | CHASE BANK |
| WIRE DEPT. ADDRESS: | 1012-1 RILEY STREET FOLSOM, CA 95630 |
| ROUTING/ABA NUMBER: | 322271627 |
| SWIFT NUMBER: | CHASUS33 |
| ACCOUNT NUMBER: | 919239731 |
| ACCOUNT TITLE: | JOSEPH A. HOFFMAN ATTORNEY AT LAW |

****ANY MONIES RECEIVED IN THIS ACCOUNT WILL BE DEEMED AS RECEIVED BY DANIEL L. CHARTRAW

# EXHIBIT E

1  BENJAMIN B. WAGNER
   United States Attorney
2  MICHAEL D. ANDERSON
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5
6  Attorneys for the United States of America
7
8              IN THE UNITED STATES DISTRICT COURT
9              EASTERN DISTRICT OF CALIFORNIA
10
11 UNITED STATES OF AMERICA,            CASE NO.
12                    Plaintiff,        VIOLATION: 18 U.S.C. § 1343 –
                                        WIRE FRAUD (18 COUNTS)
13 v.
14 DANIEL CHARTRAW,
15                    Defendant,
16
17              I N D I C T M E N T
18 COUNTS ONE THROUGH EIGHTEEN:   [18 U.S.C. § 1343 – Wire Fraud]
19      The Grand Jury charges:
20                  DANIEL CHARTRAW,
21 defendant herein, as follows:
22              I.  INTRODUCTION
23      At all times relevant to the indictment:
24      1.      Defendant DANIEL CHARTRAW is an individual with a primary residence in El
25 Dorado County, California, until late 2010, at which time he moved to Monterey County.
26      2.      Geneva Capital Solutions, Grande Armi, LLC, Geneva Prestige Global Group, LLC,
27 and Geneva Partners, LLC, are entities in which defendant CHARTRAW had an ownership and
28 management interest that purport to deal in investments in mining, precious metals and other

                              1

1   investments.  Geneva Capital Solutions has a Wells Fargo bank account located in El Dorado

2   County, California.  In fact, these entities appear to be shell companies with no employees and no

3   assets.

4           3.       Defendant CHARTRAW maintained personal and/or business bank accounts with

5   J.P. Morgan Chase, El Dorado Savings Bank, and Wells Fargo in the Eastern District of California.

6           4.       The Darwin Mine is a uranium mine owned by J.S. that is located in California, near

7   the Nevada border.  The Darwin Mine was neither owned nor managed by defendant CHARTRAW.

8           5.       The Miller's Mill is a facility that refines mined minerals that is located in Nevada.

9   J.S. had an option to purchase the Miller's Mill.  The Miller's Mill was neither owned nor managed

10  by defendant CHARTRAW.

11          6.       AZ Rock Holdings ("AZ Rock") is a mining company based in Arizona.  AZ Rock

12  was neither owned nor managed by defendant CHARTRAW or by L.G.

13          7.       Cascabel Bank is a shell company that is not licensed to operate as a financial

14  institution of any kind.

15                              II.  SCHEME TO DEFRAUD

16          8.       Beginning on a date unknown to the Grand Jury, but not later than on or about

17  January 1, 2007, and continuing to and including on or about November 31, 2011, in the State and

18  Eastern District of California and elsewhere, defendant knowingly devised, participated in, and

19  executed a material scheme to defraud and to obtain money by means of materially false and

20  fraudulent pretenses, representations and promises, and the concealment of material facts.

21          9.       The purpose of the scheme was to obtain money from individuals in the form of

22  loans, investments and the purchase of various types of commodities.  In all cases, defendant

23  CHARTRAW had neither the intention, ability, expertise, or financial means to repay the loans or to

24  perform on the promises that he made to prospective investors.

25         10.     Between in or about February 2007 and November 2011, CHARTRAW collected

26  approximately $2.4 million from investors.

27  ////

28  ////

III.  MANNER AND MEANS

11.   The Darwin Mine Fraud

a.   Between in or about late 2007 and in or about January 2008, defendant CHARTRAW approached an investment company located in San Francisco, California, seeking a $15 million loan.

b.   In connection with the loan request, defendant CHARTRAW made the following false and fraudulent statements of material fact to T.F., a partner in the investment company:

(1)   That he owned a company that had an ownership interest in the Darwin Mine;

(2)   That he had an ownership interest in Miller's Mill;

(3)   That he had a current net worth in excess of $75 million;

(4)   That the purpose of the loan was to permit the Darwin Mine and Miller's Mill to resume operations;

(5)   That he was pursuing financing for equipment to be used at the mine, that he intended to use the loan proceeds to make payments related to mining equipment, and that as security for the loan he intended to record liens on real property in favor of T.F.

c.   Based on the foregoing representations, T.F. extended a $75,000 loan to defendant CHARTRAW, which defendant CHARTRAW used for his own personal expenses.

12.   The Oil Broker Fraud

a.   In approximately March 2009, defendant CHARTRAW fraudulently obtained $25,000 each from A.R. and P.W. by claiming that he could help them become brokers of oil and refined oil commodities.

b.   In connection with this transaction, defendant CHARTRAW made the following false and fraudulent statements of material fact to A.R. and P.W.:

(1)   That in return for $50,000, he would set up bank accounts in their names into which he would deposit $100 million so A.R. and P.W. could build credibility as high asset individuals;

3

1      (2)    That the $50,000 provided by A.R. and P.W. would be placed in segregated
2      accounts that would not be drawn upon for any purpose;
3      (3)    That the $50,000 provided by A.R. and P.W. would be secured by a
4      promissory note signed by S.L., when, in fact, S.L.'s signature was forged;
5      c.    Based on the foregoing representations, A.R. and P.W. each gave $25,000 to
6  Geneva Capital Solutions, LLC, an entity controlled by defendant CHARTRAW, which defendant
7  CHARTRAW then proceeded to use for his own personal expenses.
8      13.    <u>Fraud Involving Contract for Sale of "Concentrate"</u>
9      a.    In approximately March 2009, defendant CHARTRAW fraudulently obtained
10 $25,000 from M.H. and $75,000 from R.M. by entering into a contract to sell 180 barrels of
11 "concentrate" to them that defendant Chartraw claimed contained precious metals.
12     b.    In connection with this transaction, defendant CHARTRAW made the
13 following material false and fraudulent statements of material fact to M.H. and R.M.:
14     (1)    That his company, Geneva Prestige Global Group, LLC, owned the 180
15     barrels of concentrate;
16     (2)    That the concentrate was insured by a $20 million insurance policy with
17     Lloyds of London that guaranteed the value of the solution;
18     (3)    That the assays he provided to M.H. and R.M. were true and correct and
19     showed that the barrels were valuable;
20     (4)    That he would retain the money from M.H. and R.M. as a refundable deposit
21     pending their testing of the viability of the concentrate;
22     c.    Based on the foregoing representations, M.H. and R.M. gave $25,000 and
23 $75,000 respectively to Geneva Prestige Global Group, LLC, an entity controlled by defendant
24 CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.
25     14.    <u>The Dairy Financing Fraud</u>
26     a.    In or about October 2009, defendant CHARTRAW fraudulently obtained
27 $200,000 from W.V.B., an owner and operator of dairies who was in the process of raising financing
28 for the development of new dairy properties to be sold to citizens of the Netherlands.  Defendant

4

1     CHARTRAW offered to fund W.V.B. with $250 million from a bank that defendant CHARTRAW

2     claimed he controlled, but required that W.V.B. first wire him $200,000 as an advanced fee.

3               b.       In connection with this transaction, defendant CHARTRAW made the

4     following material false and fraudulent statements of material fact to W.V.B.:

5               (1)       That he owned a licensed and operational offshore bank;

6               (2)       That he had a genuine 1.5 billion Euro Certificate of Deposit from Cascabel

7                            Bank that would allow him to finance W.V.B.'s investment;

8               (3)       That the Certificate of Deposit could be placed with a bank in order to back a

9                            "trading program" that would generate sizable returns;

10             c.       Based on the foregoing representations, W.V.B. gave defendant CHARTRAW

11     $200,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

12           15.     <u>The Gold Refinery Financing Fraud</u>

13               a.       In on or about November 2009, defendant CHARTRAW fraudulently

14     obtained $100,000 from D.G. as an advanced fee for defendant CHARTRAW's promise that he

15     would secure up to $10 million in funding from Cascabel Bank for D.G. to build a gold refinery.

16               b.       In connection with this transaction, defendant CHARTRAW made the

17     following material false and fraudulent statements of material fact to D.G.:

18               (1)       That he owned an interest in Cascabel Bank, a licensed and operational

19                            offshore bank;

20               (2)       That he would use the $100,000 provided by D.G. to obtain funding for D.G;

21               (3)       That he owned a 50% interest in the AZ Rock Mine in Arizona;

22             c.       Based on the foregoing representations, D.G. gave defendant CHARTRAW

23     $100,000, which defendant CHARTRAW then proceeded to use for his own personal expenses.

24           16.     <u>The Dore Bar Fraud</u>

25               a.       In or about November 2010 through in or about March 2011, defendant

26     CHARTRAW and L.G., fraudulently obtained $1 million from J.F.C., in exchange for the purchase

27     of "dore bars" from AZ Rock Holdings ("AZ Rock"), which defendant CHARTRAW claimed

28     contained precious metals.

5

1            b.      In connection with this transaction, defendant CHARTRAW made the

2    following material false and fraudulent statements of material fact to J.F.C.:

3           (1)    That he and L.G. were officers of AZ Rock with authority to act on behalf of

4                that company;

5           (2)    That the $1 million provided by J.F.C. would be placed in an escrow account

6                in the name of L.G., omitting to tell J.F.C. that that account was actually

7                controlled by defendant CHARTRAW and L.G.;

8           (3)    That the $1 million provided by J.F.C. would be used to purchase "dore bars"

9                from AZ Rock;

10           c.      To further induce J.F.C. to go forward with this investment, defendant

11   CHARTRAW represented to J.F.C. that his money would be safely held in an escrow account at J.P.

12   Morgan Chase Bank in the name of 1st National Title Insurance Agency (1st National).  However,

13   after the transfer of the J.F.C.'s funds to that account defendant CHARTRAW and L.G. provided, or

14   caused to be provided, to 1st National a materially false and forged "Letter of Introduction and

15   Mandate Authority" purporting to be from AZ Rock.  This letter fraudulently listed defendant

16   CHARTRAW as a "Principle/Partner" in AZ Rock and contained the defendant's signature and the

17   forged signature of L.N., the true owner of AZ Rock.  The letter also falsely purported to give L.G.

18   authority to act on behalf of AZ Rock.  In reliance on this letter, between on or about November 22,

19   2010, and on or about March 16, 2011, 1st National disbursed the funds from the escrow account to

20   personal accounts controlled by defendant CHARTRAW and L.G., and to an attorney client trust

21   account maintained by attorney J.H. on behalf of defendant CHARTRAW.  Thereafter, defendant

22   CHARTRAW and L.G. used these funds for their own personal expenses.

23         17.    <u>The "Trading Platform" Fraud</u>

24           a.      In or about February 2010, defendant CHARTRAW fraudulently obtained

25   $113,258.30 from G.A. by fraudulently telling G.A. that he would invest the money on G.A.'s behalf

26   in a "trading platform" at a bank where it would generate 15% interest every 30 days before being

27   returned after 90 days.

28                                   6

1        b.  In connection with this transaction, defendant CHARTRAW made the

2  following material false and fraudulent statements of material fact to G.A.:

3        (1)  That such "trading platforms" exist when in truth and in fact as defendant

4        knew such investments do not exist;

5        (2)  That G.A.'s money would be added to a pool of money that defendant

6        CHARTRAW already had invested in this "trading platform";

7        (3)  That G.A.'s money would remain available to him to withdraw at any time;

8        c.  Based on the foregoing representations, G.A. gave defendant CHARTRAW

9  $113,258.30, which defendant CHARTRAW then proceeded to use for his own personal expenses.

10    18.  The Gold Refining Equipment Loan Fraud

11        a.  Between in or about April 2011 and in or about June 2011, defendant

12  CHARTRAW, fraudulently obtained loans of $50,000 from J.K., $25,000 from J.C., and $75,000

13  from H.G.

14        b.  In connection with these loans, defendant CHARTRAW made the

15  following material false and fraudulent statements of material fact to J.K., J.C., and H.G.:

16        (1)  That he was a wealthy individual who was asset rich, but cash poor;

17        (2)  That he owned a gold mine;

18        (3)  That he had a lease on a piece of gold refining equipment;

19        (4)  That he intended to use the borrowed money to make a lease payment on a

20        piece of gold refining equipment:

21        (5)  That in return for the loans defendant CHARTRAW would transfer a quantity

22        of gold to J.C. as collateral and repay the loan plus six percent interest within

23        five days;

24        (6)  That he had actually shipped a quantity of gold to J.C. to act as collateral for

25        J.C. and H.G.'s loans;

26        c.  In furtherance of the scheme to defraud, defendant CHARTRAW provided

27  H.G. with a document purporting to be a Bill of Lading fraudulently representing that the defendant

28  had shipped a quantity of gold to J.C. via Hellman Worldwide logistics.

7

1           d.     Based on the foregoing representations, J.K., J.C., and H.G. provided money

2    to defendant CHARTRAW, which defendant CHARTRAW then proceeded to use for his own

3    personal expenses.

4          19.   <u>The Movie Production Fraud</u>

5           a.     In or about January 2010, defendant CHARTRAW fraudulently obtained

6    $100,000 from S.F., a movie producer who was seeking financing for a movie.  Defendant

7    CHARTRAW offered to fund S.F.'s movie production in the initial amount of $500,000 with a

8    further agreement to provide $350 million in funds; however, defendant CHARTRAW stated that he

9    would need a $100,000 fee from S.F. in order to allow the use of a $100 million certificate of deposit

10   in order to generate revenue for the financing.

11          b.     In connection with this transaction, defendant CHARTRAW made the

12   following material false and fraudulent statements of material fact to S.F.:

13          (1)     That he had a genuine $100 million certificate of deposit with Cascabel Bank;

14          (2)     That he would use the $100,000 from S.F. for fees associated with the $100

15                million certificate of deposit;

16          (3)     That the certificate of deposit could be used in a "trading program" between

17                banks;

18          (4)     That defendant CHARTRAW intended to return S.F.'s $100,000 on or about

19                January 11, 2010

20          c.     Based on the foregoing representations, S.F. provided $100,000 to defendant

21   CHARTRAW, which defendant CHARTRAW then proceeded to use for his own personal expenses.

22                          <u>III.  USE OF INTERSTATE WIRES</u>

23         20.   On or about the dates listed below, in the State and Eastern District of California, for

24   the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so,

25   the defendant, as more specifically set forth below, knowingly transmitted and caused to be

26   transmitted by means of wire communication in interstate commerce certain writings, signs, signals,

27   pictures and sounds.

28

| COUNT | DATE OF WIRE | WIRE AMOUNT | VICTIM | SENDER ACCOUNT ENDING | RECEIVER ACCOUNT ENDING |
|---|---|---|---|---|---|
| 1 | December 20, 2007 | $50,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 2 | January 24, 2008 | $25,000 | T.F. | Wells Fargo Bank -3907 | El Dorado Savings Bank -1110 |
| 3 | March 3, 2009 | $25,000 | A.R. | CitiBank, NA -0593 | Wells Fargo Bank -5565 |
| 4 | March 3, 2009 | $25,000 | P.W. | RaboBank -6201 | Wells Fargo Bank -5565 |
| 5 | March 20, 2009 | $25,000 | M.H. | Ensign Federal Credit Union -2334 | Wells Fargo Bank -5565 |
| 6 | March 27, 2009 | $75,000 | R.M. | JP Morgan Chase Bank -7316 | Well Fargo Bank -5565 |
| 7 | November 6, 2009 | $200,000 | W.V.B | Rabobank -7242 | City National Bank -2036 |
| 8. | November 20, 2009 | $100,000 | F.V. | JP Morgan Chase Bank -1241 | JP Morgan Chase Bank -9335 |
| 9 | November 22, 2010 | $400,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9731 |
| 10 | December 23, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 11 | December 31, 2010 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 12 | January 14, 2011 | $10,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 13 | January 26, 2011 | $5,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 14 | March 16, 2011 | $8,000 | J.F.C. | JP Morgan Chase Bank -3443 | JP Morgan Chase Bank -9335 |
| 15 | February 1, 2010 | $113,800 | G.A. | Wachovia Bank NA -5092 | JP Morgan Chase Bank -9335 |
| 16 | November 4, 2009 | $30,000 | S.F. | Wells Fargo Bank -2849 | Wells Fargo Bank -1519 |
| 17 | April 11, 2011 | $50,000 | T.D. | HSBC Bank -1220 | JP Morgan Chase Bank -9731 |
| 18 | June 7, 2011 | $75,000 | T.D. | TD Ameritrade -8855 | JP Morgan Chase Bank -9731 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL.

FOREPERSON

BENJAMIN B. WAGNER
United States Attorney

9

EXHIBIT F

# MorganStanley
# SmithBarney

## TRANSACTION NOTIFICATION



#BWNJGXK
S000000676   05 C487 T000000002 **

DENTAL IMPLANT PROSTHETIC OF N.AMER
6 RADCLIFF DR
GREAT NECK, NY 11024-1612

DATE: 04-11-2011

ACCOUNT NUMBER
XXX-XXXX22-0-888

In accordance with your instructions, we have completed a wire transfer for $50,000.00 as follows from your account.

To: JPMORGAN CHASE BANK, NA
For the benefit of: JOSEPH A HOFFMAN
Account Number: XXXXXX731

Please direct any inquiries concerning this transaction to our Customer Service Department at (800) 317-4420.

*Funds transfer on April 11/2011*
*wire funds sent Joseph A. Hoffman*
*$50,000.00*
*Account# 919 239731*

Page 1 of 1

# CHASE ◘

June 01, 2011 through June 30, 2011
Account Number:   000000890823107

## FEES AND OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/03 | Wire Online Domestic Fee | $25.00 |
| 06/06 | 06/06 Transfer To Chk Xxxxxx9335 | 25,000.00 |
| 06/09 | Wire Online Domestic Fee | 25.00 |
| 06/15 | Wire Online Domestic Fee | 25.00 |
| 06/17 | Non-Chase ATM Fee-With | 2.00 |
| 06/17 | Non-Chase ATM Fee-With | 2.00 |
| 06/17 | Non-Chase ATM Fee-With | 2.00 |
| 06/17 | Non-Chase ATM Fee-With | 2.00 |
| 06/21 | 06/21 Withdrawal | 1,500.00 |
| 06/23 | Wire Online Domestic Fee | 25.00 |
| 06/24 | Wire Online Domestic Fee | 25.00 |
| **Total Fees & Other Withdrawals** | | **$26,633.00** |

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|
| 06/01 | $88,116.46 | 06/16 | 16,883.16 |
| 06/02 | 60,199.95 | 06/17 | 16,063.16 |
| 06/03 | 47,041.43 | 06/20 | 7,794.28 |
| 06/06 | 21,793.43 | 06/21 | 6,194.28 |
| 06/08 | 20,793.43 | 06/22 | 5,694.28 |
| 06/09 | 15,611.18 | 06/23 | 18,454.33 |
| 06/10 | 14,855.76 | 06/24 | 14,766.93 |
| 06/13 | 12,996.94 | 06/27 | 9,266.93 |
| 06/14 | 22,704.61 | 06/28 | 7,852.74 |
| 06/15 | 20,176.61 | 06/29 | 7,752.74 |

## SERVICE CHARGE SUMMARY

| TRANSACTIONS FOR SERVICE FEE CALCULATION | NUMBER OF TRANSACTIONS |
|-------------------------------------------|-------------------------|
| Checks Paid / Debits | 53 |
| Deposits / Credits | 5 |
| Deposited Items | 2 |
| **Transaction Total** | **60** |

| SERVICE FEE CALCULATION | AMOUNT |
|--------------------------|--------|
| Service Fee | $18.00 |
| Service Fee Credit | -$18.00 |
| Net Service Fee | $0.00 |
| Excessive Transaction Fees (Above 0) | $0.00 |
| **Total Service Fees** | **$0.00** |

 **Ameritrade**

July 25, 2011

Henry Gimenez and Stephanie Gimenez
2 Dunes Ln.
Port Washington, NY 11050

Re: TD AMERITRADE account ending in 8855

Dear Henry Gimenez and Stephanie Gimenez,

Thank you for allowing me to assist you today. Pursuant to your request, this letter is to serve as confirmation that on June 7, 2011, a wire in the amount of $75,000.00 was disbursed from your TD Ameritrade account to a JP Morgan Chase Bank account ending 1627 for the benefit of Joseph A. Hoffman Attorney At Law.

If you have any further questions, please contact 800-669-3900 to speak with a TD AMERITRADE Client Services representative, or e-mail us at clientservices@tdameritrade.com. We are available 24 hours a day, seven days a week.

Sincerely,

Kayla Derr
Research & Resolution
TD AMERITRADE

This information is furnished as part of a general information service and TD AMERITRADE shall not be liable for any damages arising out of any inaccuracy in the information. Because this information may differ from your TD AMERITRADE monthly statement, you should rely only on the TD AMERITRADE monthly statement as the official record of your TD AMERITRADE account.

TD AMERITRADE does not provide investment, legal or tax advice. Please consult your investment, legal or tax advisor regarding tax consequences of your transactions.

TD AMERITRADE, Inc., member FINRA/SIPC/NFA. TD AMERITRADE is a trademark jointly owned by TD AMERITRADE IP Company, Inc. and The Toronto-Dominion Bank. © 2010 TD AMERITRADE IP Company, Inc. All rights reserved. Used with permission.

10825 Farnam Drive, Omaha, NE 68154 | 800-669-3900 | www.tdameritrade.com